Secretary, U.S. Department of Health and Human Services, Mr. Collins for the appellant, Mr. Schultz for the affiliate. Good morning. Good morning, Your Honor. As you may have pleased the court, my name is Ben Collins. I'm with my partner, Stephen Nash, on behalf of the appellant hospitals. Congress created the outlier program to give hospitals both the means and the incentive to treat extremely high cost cases. And he created a bit of a bargain where hospitals would take what amounts to a 5, 6 percent haircut on all of their regular case payments to be fund what amounts to a pool for outlier payments. And the secretary sets a threshold governing access to that fund. And that threshold has been established in prior decisions of this court. It's supposed to be set at a level likely to pay out total case payments in the amount offset by the secretary. Compliant hospitals have lived up to their end of that bargain, each year paying into the fund. The secretary, unfortunately, has not. Despite warnings, the secretary unreasonably set thresholds. You say warnings unreasonably. No one knew about turbocharging until 2003, and it was a Wall Street analyst who came up with it. Now, I think unless you have some claim that HHS was sitting on information that the public didn't have, how can you say they were unreasonable in detecting that which no one else detected except a Wall Street analyst? Well, Your Honor, when I say there are early warnings, I'm talking about the comments on the initial regulations, which were addressed in brief. And the agency discounted those comments, addressed them, but discounted them and said, we do not believe there will be excessive charge inflation. And they were wrong about that, but the issue is should they have known about turbocharging, right? Correct. What's your basis for arguing that they should have known about turbocharging before 2003? Our argument is not premise that they had to know about turbocharging, but our argument is that they should have inquired as to why the thresholds were repeatedly being set at higher and higher levels, hyperinflated and failing to contain or mushrooming overpayment. So their modeling assumptions were not playing out in the real results, and our argument based on the authority we cited is that they should have inquired, and had they inquired, they may have uncovered the turbocharging problem much sooner. But the problem is the agency did not do any kind of inquiry and just plowed forward. And these projections of the unlawful claims, as I said, led the Secretary to escalate the threshold by an extreme amount. By the way, do you make any allegation that they were sitting on knowledge, that they had access to knowledge that the public didn't? Well, one bit of knowledge they did have access to was which hospitals had defaulted in the statewide average. That's one bit, but we're not alleging, and the record doesn't show, that the agency had specific knowledge of turbocharging prior to 2003. These thresholds, of course, did very little to block the payments to the turbochargers, but critically, they blocked claims for the truly high-cost cases. And the Secretary's failure was especially stark starting in 2003 when the agency, after it acknowledged the problem, but did nothing to address prospective underpayment, the underpayments respectively for the hospitals, and kept the threshold artificially high that year. So what's your response to the government's argument that even if there would have been adjustments made in light of turbocharging, that that would have been in order to be non-offending hospitals' detriment rather than to their benefit? Well, their standing argument is we believe that in the early years, if the Secretary made an inquiry and made adjustments, the adjustments would have been to exclude payments to turbochargers in some fashion. And we're not arguing that the Secretary should amend the regulations any sooner. There are other means that the Secretary could accomplish that same goal and still calibrate a threshold that's based on non-turbocharged payments. But then, starting in mid-2003, if the Secretary had properly adjusted turbocharged data and going forward had made the adjustments that we believe were necessary, then the benefit would have been in order to the hospitals in the form of lower thresholds. In other words, your response basically is that, look, it might be true that it would have been in order to our detriment if you presupposed that payments to turbocharging hospitals still continue at the same pace, but there's no need to assume that because once you find out the turbocharging is happening, then presumably you'd do something to the turbocharging hospitals. That's correct, Your Honor. In essence here, the bargain that Congress intended became a system where the compliant hospitals paid for the turbocharger's action even after turbocharging stopped. And I'll focus for a moment on two clauses of the statute of 1395 WWB 5A, the subsection of the Inpatient Prospective Payment Statute that governs. Clause 3 directs that an outlier payment shall approximate the marginal cost of care beyond the threshold. And Clause 4 states that total payments made under the subparagraph shall be 5 to 6 percent of total projected regular case payments, also known as DRT payments. In County of Los Angeles, this court provided guidance as to both of those clauses, that the third clause employs mandatory language rather than a discretionary guideline, and that the fourth clause means the agency must set a threshold as enunciated by Judge Wald at a level that is likely to produce total outlier payments in the 5 to 6 percent statutory range. And with the statute in mind... Speaking for the court. Judge Wald speaking for the court. Correct. Well, not just a concurring opinion. No, thank you, Your Honor. Speaking for the court. So as I understand your statutory argument, it's that even... These are my words, not yours. Even deferring to the agency's expertise in light of the complexity of the statute, statutory scheme, necessarily the agency was under a duty to, at least once it was aware of the turbocharging, to eliminate that corrupted information from the base on which it was going to make these other predictions and then ultimately payments. In other words, the agency had no... The Secretary had no choice. Congress clearly didn't intend for the agency to make its projections, payments on the basis of corrupted data. And that's our argument, Your Honor. And it's not really that it was corrupted, but the data was... Is that your argument globally for all the years or just for 2004? That is our argument primarily for 2003, but it carries forward a little bit into the later years as well. It does not... That's not our argument we're pressing with respect to the years prior to mid-2003. The rulemaking is prior to mid-2003. Why do you resist the phrase corrupted data? I don't... That's a good phrase for it, polluted or corrupted data. And what fundamentally are... The reason why the agency should not have counted that corrupted data going forward is because it didn't meet the basic definition of an outlier payment under the statute, which was under Clause 3, where the payment approximates the marginal cost of care above the threshold. The turbocharge claim is wildly in excess of the marginal cost of care. So you could... So turbocharge is one example of a claim that is going to result in a discrepancy between the 5.1% projection and the actual total of outlier payments that come out. But there's all kinds of other things that can result in a discrepancy too, right? And so they're... After all, it's based on projections. They're forward-looking projections, and we already know from County of Los Angeles that it's not real-time, you know, accrual accounting, I'm sorry, cash accounting, where you have to kind of update on an hourly basis every time you get a new data that tells you that some projections you made might have been off. Yes. So if that's true with respect to all the other things that could become apparent that let the agency know and the industry know that the initial projections might have been off, what's different about turbocharging that required the agency to make adjustments midstream in a way that it wouldn't have had to under County of Los Angeles with respect to all kinds of other things that might come up? Well, certainly, Your Honor, and we agree with you, the approximate in that clause of the statute suggests the agency... It did not have to be exactly the same as cost. It did not require clairvoyance or absolute perfection, but the court doesn't have to draw the line here between what is improper and what's proper because the agency had already concluded that the turbocharged payments crossed the line. No, but I think Judge Srinivasan is focusing on the fact that, you know, many things may not be perfect, and why was the agency required in 2003 to make this mid-year adjustment? And I'll just add, particularly when the agency offered an explanation that, in its opinion, making that mid-year adjustment, as your client suggests, would have created its own problems and the agency was convinced that the result, in terms of its threshold, would be much the same. Well, the agency said it would be a problem to adjust it upward slightly, and given the balance of the year, it didn't think it was worth upsetting expectations of hospitals. But the key difference here is, number one, the secretary has not construed the statute that it was proper to project the turbocharged payments. There is not a construction in the record by the agency. There's this construction in counsel's briefs, but that's not something that the court has to defer. But the county of Los Angeles actually forbid HHS from making mid-year corrections, and I thought that was the whole gist of it, was to say we have this complex statutory scheme, and the basis of it is prospective payments. And obviously it didn't deal with the facts of this case, but the language is pretty strong that it's not going to allow for mid-year course corrections. How do you get around that? That language in County of LA addresses the circumstance of a retrospective correction after the end of the year, or, alternatively, making, as Judge Chernivov suggested, some kind of real-time course correction throughout the year if you had the accounting system, and it had to be precise. That is, County of Los Angeles said the agency doesn't have to accept the agency's argument, but didn't need to make that kind of a change. But here, as in 2003, it's prospective determination. I think you're reading County of Los Angeles a little too narrowly. As I read it, it turns on the idea that it's supposed to be prospective, and that the HHS duty is prior to the year to set the mark and no mid-course corrections. And, Your Honor, here the Secretary stated it had the authority to make a mid-year correction. So I don't think any party disputes that the agency had that authority to make the mid-year correction. The question is whether the nature of the correction. Pardon me? You're just quarreling with the type of correction that they make. A mid-year guess, a mid-year correction, as opposed to the County of Los Angeles scenario paints a little bit of a different burden for the Secretary if after they had to true up total outlier payments. Arguments and claims don't depend on a true up. What they depend on is when the agency knows that its threshold is, and when the record shows that the agency's threshold, respectively, is not going to pay out what are valid outlier payments under the statute, it has the authority to, and it needs to make an adjustment in order to avoid our transfer of the statute. The way you just phrased it, it makes it sound like the reason why the Secretary, the reason that the Secretary was required to make a mid-course adjustment in 03 and it wouldn't be required to do it in other situations is because the statute was being violated. Because under your reading of the statute, making outlier payments in a time of turbocharging, of known turbocharging, results in a statutory violation. Because otherwise, so in other words, the statutory argument completely disposes of the Secretary's discretion. Because if you don't think there's a statutory violation, then the Secretary's discretion not to make a mid-course correction looks the same as any time in which the Secretary in the middle of the year realizes that projections are off. Maybe they're not off in a way that violates the statute, but the projections are off. But I know I don't need to make a correction. Do you see what I'm saying? I do see what you're saying, Your Honor. And we definitely argue and contend that there is a statutory violation occurred in mid-2003. We'd also... But I'm just wondering, is there something, suppose, I know you have that argument. I'm not telling you that I disagree with it, but suppose I do, just by, just assume that I do, for argument's purposes. Is there something independent then left to your argument that there needed to be a mid-course correction that would distinguish the TurboCharge situation from any situation in which the Secretary realizes there's a problem and the projections are off and we're going to come in even over and under? What really distinguishes the TurboCharge situation, the agency's record data demonstrated that there was a manifest problem with the projection. That can happen for any reason. I assume in the middle of the year they can always look at the data and think, oh boy, we're off. It could be some unforeseen industry trend. It could be something that should have been foreseen but wasn't. So that could happen any time, right? Yes, Your Honor. And the fundamental difference here was the agency did engage in a rulemaking. So we're not reviewing, we're not challenging a non-rulemaking scenario, which is what County of Los Angeles implicates. This is actually where they did engage in a rulemaking, and that rulemaking must satisfy the APA in all respects, consistent with the statute as well as not be arbitrary and capricious. So once they engaged in that rulemaking, they needed to comply with all of those obligations, and they didn't. Because the statute doesn't authorize these unlawful TurboCharge claims wildly in excess of the cost of care. The agency has consistently acknowledged that, both in the rulemaking. And the rulemaking you're talking about is the final rulemaking, not the interim one, the one that was withdrawn. You're talking about the final? Yes, Your Honor. And so with respect to that one, I'm still not following, because with that final rulemaking for those three, supposing you had a situation in which there wasn't TurboCharging, but in the course of the rulemaking in another year, it becomes apparent that the projections are just off, that there was some unforeseen occurrence that caused the projections just to be off. And everybody knows that, and everybody agrees with it. It seems like the agency would still have the discretion to say, all right, it turns out they were off, we're just not going to do anything about it. For 03, we're going to, looking forward, we're going to try to come up with better projections to take into account whatever contingency went to this problem. But for purposes of 03, we're not going to do anything about it. That seems like it would be fine, unless there's something distinct about TurboCharging, and the only distinction about TurboCharging that I've seen, which is not to say it's a minimal one, but it's your allegation that that resulted in a statutory violation. Yes, Your Honor. I mean, this was a rulemaking where the agency changed its regulations, it identified a specific problem, it quantified that problem, and then it effectively did very little to nothing to address the underpayments that were caused by that problem. And so the difference, I think, between that and another scenario where the threshold might be slightly off is, the secretary, it depends on whether the secretary is engaged in the midst of a rulemaking and what the implications are of that. And here, when the secretary was projecting what its threshold would be for the balance of 2003, it included what were unlawful TurboCharge claims, claims that were not reasonable to count under the statute. And the secretary also failed to tie the decision not to lower the threshold to the record facts. I mean, fundamentally with respect to the TurboChargers and that data, as in the 2004 rulemaking, they're nowhere to be found in the final rule. What's the authority for excluding unlawful payments? I mean, the language of the statute talks about total payments. It doesn't make this distinction between lawful and unlawful payments. I recognize the argument has a certain common sense quality to it, but is there something in the statute that requires that distinction? Well, the statute should be read in context with the other paragraphs, which the provision that talks about total payments says under the subparagraph, the D5A, what payments are made under that subparagraph and how are they defined. And subparagraph 3 defines it shall pay approximate marginal cost of care beyond the threshold. So that does not satisfy the basic test of the statute as to what an outlier payment is. And the secretary, you know, in the rulemaking acknowledged they don't. And its briefs in this case acknowledge they don't. And then the briefs that submitted in the Boca Raton case acknowledge they don't. So the agency has never taken a position that these TurboCharge claims somehow met the definition of an outlier payment, yet it still pays them apparently. The record also, the record reflects savings of up to $500 million related to the largest hospital chain that caused the TurboCharging problem to be exposed in the first place. The secretary testified about that in March, and that was certainly a fact the secretary was aware of. I'm sorry, the CMS administrator testified about that in March and should have been aware of that fact when they deliberated in June. Let me ask you, I mean, the secretary has other means of, and I gather has, made collections from those TurboChargers. But when you have a system that has a two-year lag, why wouldn't it be reasonable for the secretary to say in mid-2003 exactly what the secretary said and then look to 2004 or even 2005 and 6 in the sense that what I'm describing as the corrupted data would arguably work its way out of the system because it would no longer be. Now your argument is yes, but it's there originally and it has these reverberating effects. So to the extent Congress talks about approximates and there is some discretion here, what would this court be telling the secretary were it to adopt your position? It would be telling the secretary that when it has identified payments that are neither reasonable nor consistent with the statute engaged in rulemaking or identified as payments, it needs to address them in some reasonable fashion in the rulemaking itself and can't merely count them as if they're proper, which is what happened in this case. So it has to go back to square one as it were in terms of determining the threshold for 2003 and then adjust the payments in the latter half of the year? The secretary had a duty to address them in a reasonable fashion consistently with the statute in which could have included as of when the secretary had quantified and knew about these payments. From that point forward, they should all be excluded. So let me just understand something about this scheme from the hospital's perspective. If one of your clients should have received an outlier payment, you give me a number, and it didn't, while the secretary can recover from the turbochargers, what's the mechanism by which your client can recover the amount of the underpayment? It's through the provider appeal right statute which allows hospitals to challenge their total program reimbursement for any given year. So as I understand it, that process has a limited amount of discretion at that level. In other words, if the secretary had said, whoever makes these decisions, I'm not going to make an adjustment in 2003 for the latter half for the following four reasons. The people in the appeals process don't have the authority to overrule that decision, do they? No, they don't. That's absolutely correct. The threshold itself dictates how the payments will be made throughout that governing period. So what I want to be clear about, in effect, and I may be wrong about this, and I hope the department corrects me on this if I am, there is no way for the hospital that receives less than it should have in an outlier payment to recover that difference other than through a rulemaking or the secretary actually making a decision to adjust the threshold. That's correct, Your Honor. The threshold would need to be lowered in order to rectify the underpayment for the hospital that didn't turbocharge. So part of what I read the secretary telling me is that complicated scheme projections, Congress has talked about approximate. You have to defer to our discretion here given this two-year lag, and it may be that hospitals have an injury, but there's no remedy. In other words, your client can never recover that underpayment amount. And the secretary's position is they don't have to change the threshold at all. We believe that they do, and, of course, if it is changed, if they are required to recalibrate the threshold without the turbocharged payments, we would get, our clients would receive some relief. But under the secretary's reading of the statute and the arguments made in the case, the compliant hospitals will be left with no remedy if the secretary's position is affirmed. And let me just address the 2004 threshold now that this court remanded in the district hospital partners case. The secretary on its remand was masked with explaining what appeared to be a manifest discrepancy in its reasoning, which was there were 123 turbochargers. At one point in time, the secretary made adjustments for only 50. And so the secretary had the opportunity to explain either that the 123 had disappeared somehow, the rest of the turbochargers were gone, or that somehow it had applied some kind of appropriate adjustment to all of the turbochargers so that that wasn't going to be a problem for setting the threshold. And before I go into some detail there, I just, I think here this is a case where the proof is in the eating of the pudding because the secretary raised the threshold by nearly 60% from 2002 to 2003, due almost entirely to turbocharging, an almost $12,000 increase, and then only dropped it by 7% after turbocharging had been stopped. So now let's look at the secretary's explanation. The secretary's explanation glosses over the fact that the record data contained data from many more turbochargers. And in essence, what the secretary did was ask far too, it redefined who would be a turbocharger. It now states, with additional information that it didn't provide in the original rulemaking, that it determined them based on these two reconciliation criteria. Well, the secretary knew that those criteria would not address all of the turbocharged data, and the threshold that resulted clearly reflects that. And the secretary's explanation that it had applied, calculated more recent cost-to-charge ratios for all hospitals from the year 2000 should have mollified the situation. Well, it didn't for the turbochargers. It was adequate, perhaps, for the average compliant hospital, but for the turbochargers, that 2000-era charge ratio was going to be multiplied against charges that had been turbocharged by another two years in its data. So on its face, it was inadequate. So I'm a little confused because there seems like there's two different arguments going on here, both of which maybe lead to the same conclusion. One of them has to do with why not apply the same methodology with respect to the other 73 of the 123 as the secretary applies to the first 50? So there's that argument, which I understand. And that was part of the district hospital remand. And you have an argument that, well, the same reasons that you adjust the CCR for the 50 should have applied to the other 73 also. But there's another argument, I think, which is broader, which is that why include turbocharged inflation in the projections at all? Period. Not anything having to do with the 50 versus the 123, but just period. Why include turbocharged inflation in the projections at all, given that a new rule was coming in to force that was supposed to deal with turbocharging? Am I right that there's two different? You're absolutely right, Your Honor. And I was addressing the first argument, which is you cannot – it was irrational to apply 2000-era charge ratios to the rest of the turbochargers because it would result in projections of continued turbocharging when there's no expectation that that's going to happen. On the second point, the charge inflation factor, it's much of the same, that the turbocharged data was going to distort everyone's average charge inflation. And the Secretary of State, it had no strong reason. I don't know if maybe it had a medium reason or a mild reason to adjust it, but it doesn't have no strong reason without any analysis. But, of course, it did because turbocharging – the turbocharged data was irrelevant at this point. It was unlawful, and it had stopped. And to the extent that there were any residual turbocharging in the data, the Secretary knew that would be addressed through a reconciliation process. So let me ask this question of reconciliation. So it seems to me that you make an argument about the irrationality of presupposing turbocharging going forward when turbocharging should have ended or at least the consequences of it should have been addressed. But then you also make an argument that it doesn't make any sense not to take into account reconciliation in future years. And those seem to be in tension because, if you're right, that turbocharging should have ended and, therefore, you shouldn't factor in turbocharging in future years, it seems equally right to say, well, then there's not going to be any need for reconciliation in future years either. Well, there would be some ongoing potential for turbocharging, which we believe the Secretary should have modeled that impact and the Secretary did model that impact to some extent with respect to the 50 in 2004, and we fully acknowledge that, but in later years did not. So we would see it as not in tension because in 2004, most of the turbocharging, the vast majority is out of the system, but the Secretary is still setting a threshold that's premised effectively on turbocharging. And the data set the Secretary used for charge inflation calculations was even more impacted by turbocharging because it went up in 2003 from 17% to almost 28%. So the record reflects it was worse data to use if you didn't address the turbocharging impact. And for the reasons, and furthermore, the Secretary has made an argument that it could have distorted her projections to address the turbocharged data and the charge inflation factor. If we took them out of the equation, we still need to project a payment stem. Well, the Secretary had that ability to do that. It's not disputed it could have simply taken them out of the charge inflation calculation and projected what their outlier payments would still be. I see I have two minutes left. All right, we'll give you some time. And I'm not sure if this is my 20 or my 30. We'll give you, that's why I said, let us hear from the Secretary and we'll give you some time on rebuttal. Thank you, Your Honor. Thank you. Good morning. Good morning, Your Honor. May it please the Court. Benjamin Schultz on behalf of the Secretary. The Secretary's task in setting the threshold in each of the relevant years was to make a prediction about what amount of payment would be made for outliers in the relevant years as a percentage of the total overall payments made in the Medicare scheme. The Secretary, each year relevant to this case, reasonably concluded that in making those predictions, that the Secretary also ought to account for the rules that were in effect, namely the existing regulations. So from 1997 through 2003, the Secretary made a calculation based on the understanding that the 1988 regulations would be in effect. When the Secretary did a calculation in mid-2003, she accounted for the fact, or he accounted at the time, I guess, for the fact that those calculations would, that those payments would be made for part of the year under the old rules and for part of the year under the new rules. And then for 2004 and going forward, the Secretary's calculations accounted for the fact that there would be new rules in place. And in each of those years, the Secretary acted reasonably. If there are questions about any specific year, I'd be happy to address them. Well, you've heard our questions, so you know what we're concerned about. Sure. Well, maybe I think the best place to start, then, is it sounds like the argument that the Appropriate Council is focusing on is the idea that somehow the Secretary was obligated, particularly in the mid-year of 2003 correction, to exclude the turbocharging payment. Well, the word Congress sets up a scheme, all right, to provide an incentive. And once the Secretary knows that people are gaming the system and throwing projections out of sync, the Secretary says, well, it's so complicated and administratively burdensome that we're just going to move forward. And you heard my concern about, well, maybe the explanation in part is this two-year lag in upsetting the system. But sort of the argument is, at some point,  to make certain that either the model and or the data are as accurate as the Secretary can reasonably determine. So there's a couple things going on there, and I hope you'll let me unpack it. Right. So, first of all, it's important to understand that in the county of Los Angeles, this court recognized that Congress, at the very least, in enacting the statute, it was reasonable for HHS to understand the statute as making these predictive models on a year-by-year basis. And they're important. We're all clear on that. Sure. So I don't know if Your Honor is talking about specifically mid-2003 or... What I'm talking about, counsel, is not complicated. Sure. Okay? I just want to understand the Secretary's obligation. Because the way I read what's happening is basically it's a complicated scheme. The Secretary has a lot of discretion. Oh, we know our model isn't perfect. We'll address that. Oh, we know our data is corrupted. We'll address that at some point. But in the meantime, the hospitals, arguably, are not receiving the outlier payments to which HHS would agree they are entitled. We don't agree with that. No, no, no. I understand the Secretary is saying I'm exercising all this discretion. But if the model was accurately coming up with the numbers and the data being fed into the model was not corrupted, the Secretary, I don't see denying that there would be a change of some kind. Your Honor, I think it's helpful to focus on individual years because the analysis is very different depending on the year. I totally agree with that. But I don't want to, you know, we can get mired in the we's. And I'm trying to understand the system given that we are very clear that there's a lot of discretion here. Sure. If you want to think about it from the macro level, and I want to urge the Court that it's important not just to look at this at the macro level but also to look at the analysis as to individual years because the analysis is distinct in different years. But from the macro level, what's going on here is Congress has set up a system in which at the beginning of the year, HHS sets the threshold, and it does it based on a projection. And that projection may be wrong. Projections often are. But it's important for hospitals in a prospective payment system to know at the outset what the rules are going to be and to operate within that. And that was something that this Court recognized in the County of Los Angeles. And so given that, if it later comes to pass that for one reason or another the projections were wrong and somebody with the benefit of hindsight could come back and say, hey, you set the threshold at this level and maybe it should have been at another level. The Secretary reasonably interprets the statute to say that that's not the way it works and it's important that everybody knows the rules going in for planning purposes. So a hospital may have suffered a harm, but there's no remedy. I quibble with the question of whether or not it's a harm in the way that would be cognizable under this Court's precedence. So you think Congress intended the Secretary to make projections on the basis of unlawful charges and payments? I think one thing to keep in mind is that at least when we're talking about 1997 through 2003, the Secretary's projections were off. That's absolutely true. But they were off in a way that very substantially harmed the Medicare Trust Fund. And the reason why is because at the beginning of the year when the Secretary sets a target percentage, that's 5.1%, it reduces the standardized amounts by that same percentage, that 5.1%. So for all those years, 1997 through 2003, where the Secretary ended up paying much more than 5.1%, that means that the standardized amounts had not been reduced by enough at the outset of the year and the Medicare Trust Fund was out many, many billions of dollars. So that's my point about no limiting because no right. Because if the Trust Fund is going down, we're going to reduce the outlier payment. We're going to increase the threshold. I understand. I just want to understand what this scheme is because, as you know, the Court asked the Secretary to look at this as the 2004, and the answers we got are pretty much the answers we had initially. Sure, and I'd be happy to address the specifics of that if the Court wants, but I understand Your Honor's question to be at the more macro level. I think the best way to think about it is a hospital is entitled to outlier payments if after accounting for the threshold, as that threshold is set, you get if you're above that threshold, then you get outlier payments, and if you're not above that threshold, then you don't. And then the only question is, as a matter of administrative law and accounting for Medicare law, did you set the threshold the right way at the beginning of the year when you sat down and did this? And I'd be happy to address this to any individual here, why HHS's calculations were reasonable, but the fact that somebody can come back with hindsight and say, you know, gee, your projections didn't work, now that we know all this that we didn't know back then. Let me ask you, why didn't HHS know it? The facts here seem a little odd to me that it's a Wall Street analyst that discovers this. Why didn't HHS discover this? Your Honor, if you think about it, it's not so obvious that this is going on because what was so surprising about this was that hospitals were intentionally manipulating their charge practices in a very distinctive way, and in a way that exploited regulations that had been in effect since 1988, that for many years this problem didn't appear to be surfacing at all, and that when it did start to surface in the late 90s, there were other explanations that HHS reasonably looked at and said, well, if we think it was this, and then after a number of years where it still proved that that didn't solve the problem, HHS said, well, all right, well, maybe we think it's this, and it was only later that this surprising information, which is really about hospital intent, I think, more than anything else that came out that HHS discovered the problem. I'll also point out that if you think about it from the perspective of the Medicare system, you have many, many thousands of hospitals and a small number of bad actors, and you've got intermediaries all over the country. There are different intermediaries processing different bills. If a small number of bad actors have these things coming in to different intermediaries, not even necessarily the same intermediary, then it's very difficult for HHS in administering this massive program to nitpick these small, tiny pieces of data and conclude from that that certain intentionally fraudulent behavior is going on. Can I ask you this? So just stepping away from the niceties of, I don't want to be pejorative about it, about what's cognizable and what gives rise to a valid legal claim, just speaking generally in terms of whether the system is working and whether the system is working fairly, I don't think the agency would dispute the notion that because of turbocharging, certain bad actors were getting a disproportionate share of appellate payments to which they shouldn't have been entitled. And had the system worked correctly, those bad actors wouldn't have gotten those payments and other hospitals would have gotten more payments. Does that generally seem right? I think your honor is right insofar as you're saying that if HHS had discovered turbocharging sooner, it probably would have acted much sooner to amend its regulations, and then you could further hypothesize from that that if the regulations are amended, then in this counterfactual world where HHS goes to set its threshold, it's going to reasonably assume that these other hypothetical regulations are in effect. And I think your honor is right that if you follow that chain out, then you could eventually get to a counterfactual world in which the threshold would be lower in the relevant years than it would have been. And that would be better for the hospitals, the good actors, or at least the non-bad actors, and it would be worse for the bad actors. I think that's right. I want to come in now because this is a subtlety that may not have come through very clearly in the brief. The methodology that HHS used up through 2002, the cost inflation methodology, was a methodology where the setting of the threshold didn't actually depend on the turbocharging because it was a methodology that just looked at the cost. It's only really 2003 that I think you have an argument that to that particular year because the agency switched to a charge inflation model that that particular argument would have worked. And even with respect to 2003, I mean, I can understand the reason the agency says we shouldn't be looking at the interim suggestion. I get that. But it's a real fact about the world that that existed. If you look at what that did, it would have put into place measures that would have resulted in a lowering of the threshold. I think if you follow that chain out at least to the beginning of 2003, you probably could get there. If the regulations had changed and then HHS had calculated a revised threshold based on new regulations, then you could eventually get to a counterfactual. But I want to highlight something very important about that, which is that part of that chain is that the regulations would have changed before they actually did. And that means several problems. Number one, it falls squarely into the Supreme Court's decision in Howard, which held that if you want to complain about an agency's failure to amend their regulations, then you have to petition for rulemaking, and nobody did here. I want to just highlight for the Court that there are many thousands of hospitals in the Medicare system, and if turbocharging was so obvious that HHS should have sua sponte recognized it, which is essentially what the plaintiff's argument is, then why is it that not a single hospital in the Medicare system was asking HHS to change its rules before it eventually did? And I'd be happy to talk about that more, but I think that just really highlights for the Court that this was not something that the agency sua sponte should have done. Yeah, I mean, it kind of depends on whether there's an allegation that there's information uniquely within the agency's arsenal that should have put the agency on notice that something's amiss, even if the industry wouldn't have been on notice. Well, I think insofar as you're saying maybe that would explain why nobody petitioned for rulemaking, I suppose that could be a pragmatic explanation of why that didn't happen. And it would also explain why our rule didn't apply. Well, I don't think it's an explanation for why our rule wouldn't apply, because at the end of the day, Howard's reasoning is based on the idea that if you want to complain about a change in a rule, there's a mechanism for that. It's hard to imagine that that logic applies in a situation in which the entity who would ask for the rule to be changed doesn't even have the information with which to make the request. Maybe it's a harder case, but first of all, I don't think that plaintiff's argument here, because what they're saying is, hey, you had these comments on the 1988 rule, and then there was this stray comment in 1984, all of which is the Federal Register. So that's obviously something that the hospitals could have known about. And frankly, I think in this kind of situation, hospitals probably have better information than HHS about the extent to which they control their own charging practices. And even if an individual hospital may not know that its sister hospitals are doing turbocharging, they probably would have a better sense of that than HHS just from the fact that it is a hospital and knows the constraints that it's operating under. Well, but counsel, you know in district hospital partners, this court relied on the State Farm in terms of the continuing duty on the part of the agency. So it's not enough to say the hospitals were at fault. Well, yeah, I think all of the cases about a continuing duty to examine assumptions agree to apply to situations in which there's an active proceeding. So to the extent that you want to say that in an individual threshold setting, I didn't read district hospital partners. Well, the agency action in district hospital partners was an individual threshold setting. The agency action challenge there wasn't about a failure to amend regulations that were already in place. And if you look at the cases that the other side is citing about the continuing duty to examine assumptions, most of those are cases where a party actually petitions for a rulemaking. And then once the issue is squarely before the agency, at that point the court says, okay, at that point the agency should... So let's deal with it. I was going to skip to 04. That's all right. Then let's talk about a year in which we're not talking about a misdemeanor correction. We're talking about 04. So with 04, what's the explanation for why turbocharging is factored into the projection when the entire premise of the new regulatory regime is that turbocharging has been dealt with? Sure. Your Honor, I think it's helpful here to step back and take a really macro level to make sure we all understand the exact mechanics of what's going on. If you think about what HHS is doing when it sets a threshold, its goal is to make a prediction about what will actually be paid out in the fiscal year. And so that means for fiscal year 2004, you kind of want to put yourself in the view, in the perspective of an intermediary who is getting these payment requests coming in from the hospital. And so a payment request comes in, and it comes in in fiscal 2004. And that fiscal 2004 payment request is based on charges in fiscal 2004. So that means one of the things that the agency is going to have to project is what are a hospital's charges going to look like in fiscal 2004? And we can talk about how HHS did that, and I'll just bracket that. Including illegal charges. Well, actually, Your Honor, I'm glad you brought that up because that gets to the next point. My hypothetical, because you don't want to answer these questions, is suppose you go to your office tonight, and you find out that there's another gaming system. And a billion dollars is being paid to hospitals that are not entitled to a nickel. Well, I hear you saying, basically, we're still going to factor that into the system, absent a regulatory change, even though the, quote, non-gaming hospitals will suffer. So, Your Honor, I want to be very clear about this, because I think Your Honor may have a misperception about some of the basic facts. And let me be crystal clear on this. That was a hypothetical. Well, I understand. But it's a hypothetical that I think may be based on a misperception. Let me make this clarification. No, my hypothetical was what happens when you get back to your office tonight, and you find out that a group of hospitals has figured out a new game. And unless something is done, the payments that are going to go out two years hence will be a billion dollars over what your model and the charges being made by hospitals that are not gaming the system would predict. So, I do want to get my answer out. But to answer your hypothetical, I think the answer is in 1395 WWV 5, Romanette 4. The total amount of the additional payments made under this subparagraph, meaning subparagraph 5, for discharges in a fiscal year may not be less than 5% or more than 6% of the total payments projected or estimated to be made. So, in other words, when HHS is setting its threshold to hit the target percentage, and here we're talking about 5.1, that means the relevant question is, what are the additional payments made under this subparagraph? So, what do you do with this information tonight? Well, we may well at that point go after these guys under the False Claims Act. That's a different issue. You're collecting from the terminal charges. I'm asking, what about the hospitals that are not gaming the system? Do you do anything to protect their entitlement? And ignore for the moment your trust fund argument, if you will. That's money, Congress, and I understand the pressures on the agency from that realm. But now we're just talking about the statutory scheme. Right. So, again, this hypothetical, I think in addressing this hypothetical, it's a little bit complicated because we don't know the specific practices and how the specific practices work might bear on the agency's response. But a couple of points. Number one, because the projection at the beginning of the year is based on the payments made under this subparagraph, if somebody is duping HHS, it may be unfortunate. We may go after them under the False Claims Act. We may take other administrative things against them to stop them and maybe ultimately even recover. But for purposes of projection, those payments that the fiscal intermediary is making are payments under this subparagraph. Frankly, I don't know what else they could be. That's my point. The hospitals that are not gaming the system have no remedy. I mean, I suppose. That's correct. That's why I signaled you when I was questioning counsel. I think that's a complicated issue. I know it's complicated. But, you know, what does Congress have in mind that, you know, there are lots of statutory schemes where agencies have to make judgments. Are these drugs safe? Is this food safe? And there's a realm of discretion there. But if it's contaminated, do you still consider that data or not? And you seem to be urging me to understand that, yes, you do. Well, let me explain why I think the hypothetical is mistaken. I think I could save us a lot of trouble. I'm happy to hear that. You cited F-4. Sure. Other than that. I'm sorry. I cited D-5 Roman MAP-4. That's right. Right. But I think, Your Honor, if you look at 2004, I want to be crystal clear that there are no illegal payments in 2004, at least none that we know of. And that's why I was trying to explain from the perspective of the intermediary to look at what's going on. So the intermediary is taking these 2004 charges, and they come in as 2004. What went into the base data? Sure. We're setting the threshold in 2004. Right. So there was some charge inflation. And the charge inflation factor does include turbocharging. But if you want me to finish this out, this explanation, I can explain why that's not a problem. If you think about what that intermediary is getting, he's getting 2004 charges, and then he's adjusting those charges to cost, as the statute says. And when he does that in 2004, he does that adjustment based on the new rules. That's hugely important because the whole reason why turbocharging was an improper practice was because the charges were these charge increases that weren't then being properly adjusted to cost. And, indeed, not only that they weren't even just being properly adjusted to cost, but there was an aspect of intentionality about it, that the hospital's charges increases were in no relationship to cost. That is not the case in 2004 for a very important reason, which is that in 2004, because we're applying the new regulations, now if you have a hospital that maybe, say, in 1999, it charged $200 for something, in 2003, because of turbocharging, it's charging $1,000. Maybe in 2004, it only raised it a little bit, say $1,010 or $1,020. The fact that you got all the way up to $1,000 from past turbocharging doesn't matter at all, because when we adjust that charge that comes in in 2004, we adjust it using the new regulations. And that's why, number one, it's not a problem that there has been past turbocharging, but it's also why, number two, if you ignored the past turbocharging, then you would make a massive mistake. So you don't ignore it. That's the whole point I'm trying to get you to acknowledge here, and you won't for some reason, and I'm just not clear why. Sure. Your Honor, if you think about it, imagine a hospital that is turbocharged. So it started out, say, at $200 in 1999. I'm not so concerned about that hospital as I am concerned about the hospitals that are not turbocharging. I understand that, but in 2004... That $1,000 figure that you were just discussing is in that state. Well, it is, but it's properly adjusted, and that's the point. To what? To cost, and that's because the new regulations... The hospital, the turbocharger says, costs us $1,000. No, that's not what the hospital says. The turbocharging hospital says we're charging $1,000, and HHS, by virtue of... What I just told you is the turbocharge hospital tells HHS's intermediary it costs... Well, respectfully, Your Honor, that's not what it says. It costs us $1,000, and we charge the client $1,200. Respectfully, Your Honor, that's not what happens, and that's because the costs for fiscal year 2004 are not known at that point, and they're not on the bills. When HHS gets a bill for an outlier, it's just a charge. It says our charge for this patient was $1,000. The true cost for 2004 is unknown at that point. It may never be known, but what happens at that point is under the new regulations, that charge is then adjusted to cost, and maybe under the old regulations, because of the lag and because there was no reconciliation... So when is it adjusted?  And the final cost report is filed? For the most part, it's not then. It's at the point that the intermediary made the payment, but if the hospital is subject to reconciliation, then after the final cost report is filed... But that assumes that you've gotten over the threshold. Yes, Your Honor, I think we may be looking at this from the wrong perspective. The threshold is set at the beginning of 2004. It's got that $1,000 in there. It's got that $1,000 in there only insofar as we want to know what this hospital's charges are going to be because we're going to adjust it to cost. And maybe if we had applied the 2003 regulations, maybe we would have only cut that by 50%, but because we're applying the new regulations, we're going to cut it maybe only... Maybe we're going to cut it by 90%. Maybe we're going to cut it by 95%. And that's why it's really important to understand that from 2004 going forward, as far as anyone can tell, there aren't illegal turbocharging. There isn't illegal turbocharging going on. It also means, and I want to make sure the Court understands this, that if you think about what charges you're going to get in 2004, you absolutely want to know that some people have been turbocharging because when that hospital submits its charges in 2004, it's not going to all of a sudden revert back to the $200. It's probably going to keep it at $1,000. Maybe even it's going to raise it even higher. And so that's why you absolutely want to say, okay, fine, you're going to give us the $1,000 because you've been turbocharging. Give us the $1,000, but this time, unlike last time, we're going to adjust that by a much, much less generous cost of charge ratio. I'm trying to unpack where we are because what seems to me to be a logical problem is that we're trying to figure out what the threshold is going to be for 2004. We have to do that by projecting charges for 2004. Correct. And the greater the charges we project, the higher the threshold so far so good. Is that correct? That is correct. All else equal, but all else is definitely not equal. All else equal. But we have to, in order to understand the effect of charges, the effect of charge inflation, let's just keep all else equal just so we can identify the operative force of this variable. Right. So if we overestimate charges, we're going to get too high of a threshold. All else equal, that is correct. Yes. Okay. So then the question becomes, we want to get charges as right as possible because all else equal, that'll be more likely to get the threshold right, and then everybody will get the right amount of outlier payments because we'll get close to the 5.1% target. Sure. Okay. So if we assume all that to be true, I'm still not understanding why it makes sense to bake in turbocharge rates when we're trying to get the charges right so that the threshold can be right, so that the 5.1% is reached, so that the outlier payments can be right. If we're going to be, by hypothesis and therefore, in an era in which turbocharging doesn't exist, why would we assume that the charges are going to be increasing at the same rate when there's not going to be turbocharging? So I think it's important to understand the data that HHS has at the time that it has to do this. So this is being done in August 2003. As HHS explained in the Federal Register, the most recent charge data it has at this point is charge data from 2002. So HHS's task is to take this 2002 charge data and from that extrapolate what are going to be the charges in 2004. So now just think about what time period this is covering. This is covering about two years. Roughly half of that period is a period in which everyone agrees turbocharging was going on. So I don't care about that, and the reason I don't care about that is because there's a half of the period when it wasn't going on. So there might be an argument that says, all right, well, you can't just completely eliminate turbocharging because it's still going on for half the period. So I get that, but what I don't understand is why assume that turbocharging is still going on at the same pace? I don't understand that. So, Your Honor, there's a couple of answers. The first is that HHS acknowledged in its remand notice that this might, in fact, lead to an overestimate of turbocharging, but the question wasn't did HHS use the best possible data in doing that. The question was just in making a projection in a highly complex world of Medicare reimbursements in a world where we had never actually seen the new regulations in effect, did HHS reasonably do what it did? And what HHS said was even though we think that this might overestimate turbocharging, the reverse would be even worse. Because if we excluded these people entirely, which is what the plaintiffs are saying we should have done, then when we projected what those hospitals' charges were going to be, and also by proxy other hospitals that started turbocharging a little bit later and aren't even ones that we know about at this point, then when we project out their charges, we're going to be massively, massively under. And so what we did was a reasonable compromise. We said, look, is this data perfect? It's not perfect. But we don't have better data, or at least we could reasonably conclude that this data was good enough. I don't remember that whole explanation being in what HHS is supposed to do. It's in the remand explanation. It's in all of what you said? I think I'm paraphrasing somewhat and maybe giving a little bit more meat on what's going on. Yes, that matters. You can definitely find in the remand explanation an acknowledgement that HHS is saying, look, we understand that turbocharging was expected to end by the beginning of 2004. We understand that not all of this period is going to be turbocharging. But they all are also saying, look, a big chunk of that period is going to be turbocharging. And because we don't think that ignoring these people entirely is going to be better, we'd rather... Let me just ask the obvious, what seems to me to be the obvious question, Mark, which is that it's true that turbocharging existed for part of the baseline period, I guess, which you're measuring, because we're talking about 03. Right. It's also true that the same hospitals that were turbocharging were still going to be submitting payments, submitting requests for payments. Correct. You can't just take them out of the system altogether. That's right. They're still in the system. I get all that. But it just still seems to me to be odd to project the same case. Why not just say, all right, they're not going to be turbocharging anymore. They're still in the system, so we'll get a discount factor. It's going to be something in between full turbocharging and no turbocharging. I see my time is up, but I do want to answer your question. Please, go ahead. First of all, I think it's very telling that this isn't an argument that the plaintiffs are making. Their argument was that we should have excluded the turbochargers entirely. Second of all, if we're going to... It is to them. That is one alternative. Correct. They say there are other obvious alternatives, and one of the obvious alternatives is the one that Sreenivasan is now discussing. Respectfully, that's not a supposedly obvious alternative that the plaintiffs have ever articulated in this litigation, as far as I understand. It's certainly not an obvious alternative that they've articulated in their briefing in this court. What they have said... Let's just be clear, counsel. What they have said is that there were a number of alternatives that were available. All right? You can't just kick them on that point. With all due respect, counsel, I think what we're trying to understand is how the system works and what the secretary's reasoning is here. I understand... That's the thrust, as I understand it, of Judge Sreenivasan's question. I understand that, and I do want to address that. I just want to make sure the court understands that this is not something that the plaintiffs have been arguing. Number one, we think it's waived, and number two, the explanation I'm about to give you, you won't see specifically in the Federal Register precisely because it wasn't an alternative that people were presenting to HHS. But what I can tell you is if you think about why HHS might not want to have done that, one reason why you can imagine that the agency wouldn't have wanted to do that is because if you think about the amount of turbocharging that is going on in 2003, if you look at the 2003 Federal Register notices, one of the things that the agency was really worried about in 2003 was that because turbocharging had become so widely known during 2003 that the agency was afraid that the pace of turbocharging was going to accelerate in 2003, both because lots of other hospitals that hadn't previously been turbochargers now learn about this and say, oh, yeah, me too, I want to do that also, and also because the existing hospitals are saying, oh, wow, I have to turbocharge even more because now that HHS is doing this charging solution. And when did HHS sue these turbo hospitals for? I believe there were some hospitals, and I want to be clear that it's not all of the 123, but there are some hospitals that HHS pursued under the False Claims Act, and there were settlements. But to finish answering Judge Trinavonstan's question, the agency was just not sure about what exactly had happened in 2003. It was very worried that 2003 was the worst year, far worse than any other years. And so you can reasonably understand why at that point the agency wouldn't want to just assume that, hey, we think it's going to be for 2003 just exactly the same as it was from 2001 to 2002. Hey, it's 2004. That's what Trinavonstan said. He is, but I think I took Judge Trinavonstan's question to be about why is it that in projecting the two-year period when only about half of that period was turbocharging, why would you just extrapolate from the prior two-year period? What I'm trying to explain is that that was an unusual first half of the two-year period, and it was the first half of the two-year period in which turbocharging probably was much worse than it had been in any prior period. Yeah. I mean, I guess the upshot it sounds to me like is that, look, it does seem odd to project forward assuming turbocharging in an era in which we've instituted measures that are supposed to deal with turbocharging. And we acknowledge that. But the oddity is explainable because even though you're not going to have turbocharging at the same pace, you're in a period in which you had a rapid increase recently. You're in a period in which there's still going to be some other hospitals potentially that are going to be turbocharging. And so all else being equal, we roughly think that the projecting at the same pace is going to account for all of that, even though it's going to be for sort of different reasons. I think that is what the agency said on remand. It said there was a lot of uncertainty, and it didn't think that the alternative of excluding these 123 was better. And it recognized that what it was doing could be imprecise, but it made a reasonable value judgment based on the data available to it at the time that this was a reasonable way to do it. And this court recognized in District Hospital that HHS's obligation is not to use the best available data. It's just to make a reasonable judgment. I think all of that is well taken, but it also has to be methodologically sensible. And in order to make it methodologically sensible and to get a lot of leeway, DHC gets a lot of leeway when it does something methodologically sensible in coming up with forecasts, no doubt about it. Sure. And I just want to make sure also I really emphasize the point that if that is the particular methodological tweak that you think the agency should have made in projecting 2004, number one, I don't believe that was a particular tweak that any commenter said, but also not a tweak that the other side I believe has ever said the agency should have done in that brief. And that matters for a couple of reasons. It matters, number one, in saying like, you know, gee, this was the kind of obvious thing that the agency should have done sua sponte. It also matters in talking about, you know, waiver just for whether or not they can bring this now springing it at oral argument. Yeah. There's one other methodological question I have. I know we're over time, but if I can just ask. Please. I'd be happy to address that. It's somewhat related, but what is the explanation for why if charge inflation is something that's taken into account for purposes of calculating the threshold, charge inflation wouldn't also be taken into account in projecting the CCR? And I think it's important there to go back to putting yourself in the position of the intermediary. So the intermediary is getting this 2004 bill, and the 2004 bill is coming in at 2004 charges. But when that 2004 bill is adjusted to charges, it's going to be multiplied by a cost-to-charge ratio. And assuming for the moment that the hospital isn't subject to reconciliation, then when the intermediary says, okay, what are your costs, it's not multiplying it by a 2004 cost-to-charge ratio. It's multiplying it by whatever the latest tentatively settled cost report is. If for some reason there's a delay and that happens to be a couple years old, then so be it. That's what it is. But if HHS is trying to project ex ante, what are those 2004 charges going to be adjusted to? It knows that it's almost certainly not going to be adjusted to a 2004 cost-to-charge ratio. It's going to be adjusted to the most recent tentatively settled cost report, whatever that is. Now, that I think answers the question of why is it that we're not using just, you know, why is it a problem that we're using somewhat old cost-to-charge ratios in particular circumstances? I recognize that that may not be a complete answer to why HHS doesn't account in its 2004 projection. For at some point during the year, you might think that their hospital is probably going to settle another cost report, and at that point there's going to be a change somewhere in the middle of the year. But I think if I'm not so worried about the change in the middle of the year, I'm talking more about this projection. Why in the projected CCR is there not a projection of a charge increase commensurate with the charge inflation that's informing the setting of the threshold? Sure, and I think that's because it's important to remember that HHS's task in setting a threshold is to kind of put themselves in the intermediary's role, to say what is the intermediary going to do in that situation? Do you think it would have been wrong to factor in a charge increase in the CCR? Well, in 2007, the agency modeled a mid-year increase, and we're not saying that that was an unreasonable choice, and we can understand why you would model a mid-year choice. We also think it was reasonable, particularly in 2004 to 2006, not to model that mid-year change. But the one thing that I think would not make sense, or at least would be very difficult to justify, is projecting it all the way out to 2004, because unless you thought the hospital was going to be subject to reconciliation, the one thing you could be pretty confident of is that when the intermediary is making the 2004 payment, he doesn't even know what the cost-to-charge ratio is in 2004. He's not going to know that for many years. Isn't that true in 2007 too? So that's why I'm trying to draw a distinction between the mid-year change versus coming up to the current cost year. So what the mid-year change is, is at the beginning of the year you're using the latest sensitively settled cost report, which is for most hospitals probably going to be the same cost report that HHS needed threshold projection based on, the same cost-to-charge ratio. At some point during the fiscal year, you're probably going to get a new one. And at that point, from that point in the fiscal year forward, it's likely that that cost-to-charge ratio is going to be lower. So in 2007, what HHS did is said, okay, let's try and model that particular tweak on the model. But that's still not the same thing as saying we're trying to trend this forward all the way to the current fiscal year. That's just saying we're trying to account for the fact that you're probably going to settle one more cost report at some point during that year. And so I'd be happy to address why it was reasonable for 2004 to 2006 not to make that particular tweak at court one. I'm fine without it. Thank you, Council. Council for a pause. Thank you, Your Honors. I just want to correct a mistake in the government's presentation that we had waived an argument regarding charge inflation. I'm quoting our summary judgment briefing at page 292 of the joint appendix before the district court. As in the IFR, the Secretary should have excluded data relating to turbochargers from its inflation calculation. So we obviously didn't waive that. I think his point was that there's a difference between saying that you should exclude turbochargers and saying that you can account for including them but have a discount factor that discounts the extent to which you're going to take out the charge inflation. I thought that was the hypothetical that was being addressed. And, Your Honor, our position is that, and the argument we presented, is their data, turbocharged data from the batch of turbochargers, should have been taken out of the charge inflation factor. And the reason why that wouldn't have distorted anything is because the agency can still project what their regular payments would be. They just wouldn't be turbocharged payments. And if the data, if the agency had modeled it and gone into granular detail and said, well, look, this is just a certain batch of hot gold. I mean, your point basically is that, yeah, we talked about excluding turbochargers, but of course that wasn't to the exclusion of counting those same hospitals in some way. You would put them back into the mix and you would assume that they would be asking for payments and you would just treat that as a normal course. Yes, Your Honor. And so I think we fairly presented that and preserved that argument for purposes of appeal. The Secretary is also addressing the 2004 rulemaking, discusses what is likely to happen in the upcoming year. And what was not likely to happen was turbocharging would continue. Council discussed the charge ratios and what should be expected for a charge ratio or what should not have been expected and what the Secretary knew would not be expected was that the turbochargers would have charge ratios based on 2000 because their cost reports would all be settled before that upcoming fiscal year. And let's just say for some reason they weren't and they were still relied on 2000-era data for their charge ratios, they would have been reconciliation candidates based on their charge inflation statistics. And so, therefore, it wasn't likely that they were going to receive the payment that the Secretary projected, which is the mandate under the statute, a prospective setting of the threshold. The Council also suggested that there was no comment identifying this precise adjustment with respect to the charge inflation factor. Well, the Federation of American Hospitals' comment with the District Court disregarding our case but was at issue in the District Hospital Partners' case actually made those suggestions. They didn't make the specific suggestion to say exclude the turbochargers and the turbocharged charge inflation data and then make a special adjustment for them, but they raised the point. And moreover, the Secretary here waived expressly any argument based on lack of comment. They did that expressly in the briefs. And why did they do that? Because they had lost many of their comments and they had no comment log. And so that's in our briefs. We established that and they waived it. I can cite to you a page in the Joint Appendix where they did it at some point, but the court needs that specific site. And effectively, as to the calculation charge inflation, the Secretary says, Well, we could have over-adjusted. We could have made a mistake by taking out too much charge inflation that might have continued. Well, what the Secretary did was guarantee that the Secretary would be wrong in the estimate because it knew that there was significant distorting data that was not reasonable to project for you, and it made no effort to make any kind of fine distinction between, you know, what was good and what was bad. It merely accepted it all as good, which was not likely to project a threshold that would achieve 5.1% payments. And I also note, Your Honor, that the argument that's been presented regarding some folks might, some turbocharging might catch fire, might become suddenly popular, even though the agency has sent out its OIG task force to crack down on it. But that wasn't an argument made in any, I'm not talking about the briefs, but that's not a justification for any of the rule in 2004 or even 2016. The agency's rulemaking doesn't suggest that there was any kind of modeling for increased turbocharging by copycat turbochargers when the era was drawing to a close. The agency's argued that this is a predictive exercise, and I would just remind the Court that the County of Los Angeles case did remand the Secretary's thresholds because they failed to predict and be consistent with the APA. So those were remanded. It was, of course, a perspective. It's discussing what your perspective determination is. And in 2000, mid-2003, it was no longer reasonable to project and predict continued turbocharging. The argument made about, well, we're in an era where part of our old regulations apply and part new apply doesn't hold up because the Secretary did not permit turbocharging under the old regulations. Just because a charge came in multiplied by a hospital's charge ratio doesn't mean it was permitted, and the Secretary has argued that in the Boca Raton case strenuously. And in its original rulemaking, it said in 1998, we don't think that charges will significantly outpace costs. That is not the assumption of our basic model. Now, I don't know how much. Just take a minute or so to wrap up. I will wrap up with two final points relating to projecting the charge ratios. The truth of the matter is that the charge ratios, and I'm now talking about 5, 6, and 7. The charge ratios would be updated all during the upcoming 18-month period and most prior to that period. Some would be updated no later than halfway through the year. And so what that meant is if the Secretary wasn't accounting for that properly, or at all in 2005 and 2006, or properly in 2007, was the guarantee that the agency was going to overproject costs, outlier payments, instead of threshold that was too high. And that was a fundamental failure to address an important aspect of the problem. I'll last just discuss the early years and, you know, the question of the agency. The agency has paid out... The agency had paid out billions out of the trust fund in excess payments, in excess of the thresholds. Well, those billions paid out in excess were to turbochargers. And the Secretary had evidence that the system had gone way off the track. And our position, we believe the law supports this, the agency had some duty to make an inquiry and not simply allow the system to proceed farther and farther off track each and every year. And had the agency made that inquiry, it could have seen its very own file. It doesn't have to... Our argument is not that they had to look at every speck and grain of data, but if they had made any inquiry, they would have seen in their own projection files turbocharging right before their eyes. Does the Court have any questions about our APA procedural claim before I wrap up? No, I think that's it. Thank you. Thank you, Your Honors. We'll take the case under advisement.
judges: Rogers, Griffith, Srinivasan